# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

PLATINUM MANAGEMENT, LLC,

        Plaintiff,

v.

        **MEMORANDUM OF LAW & ORDER**
        Civil File No. 11-3523 (MJD/JJG)

ELLIS CORPORATION and
LUDELL MANUFACTURING CO.,

        Defendants.

Andrew Stephen Dosdall, Warring Dosdall, P.A.; Benjamin R. Skjold, Christopher C. Grecian, and Christopher P. Parrington, Foley & Mansfield, PLLP; and Patrick D. Boyle, Law Office of Patrick D. Boyle, Counsel for Plaintiff.

Brian K. LaFratta, Huck Bouma PC, and Michael S. Dove and Matthew C. Berger, Gislason & Hunter LLP, Counsel for Defendants.

## I.  INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment [Docket No. 63] and Plaintiff's Phase I Motion for Partial Summary Judgment [Docket No. 68].  The Court heard oral argument on September 26, 2013.  Because the Agreement is ambiguous, the Court denies both motions for summary judgment.

## II. BACKGROUND

### A. Factual Background

#### 1. The Parties

Plaintiff Platinum Management, LLC ("Platinum") is a Minnesota limited liability company that provides consulting services, typically restructuring or "turnaround services" to struggling businesses. (Berger Aff., Ex. 2, Brennan Dep. 5-6; Berger Aff., Ex. 1, Colbert Dep. 8; Second Amended Complaint ("SAC") ¶ 1.) Each situation performing turnaround services is unique, and not every client requires every type of service that Platinum provides. (Berger Aff., Ex. 3, Mallory Dep. 15-16.) Generally, turnaround services include 1) assessing and providing guidance regarding the management of the client; 2) assessing the cash flow, cash management, and accounting of the client; 3) assessing production or business operations of the client; 4) assisting the client with its relationship with vendors; 5) assisting the client with its relationship with existing lenders; 6) assessing the client's need for additional capital or financing and identifying sources for financing; and 7) identifying potential new lenders and assisting the client in obtaining additional financing from new lenders. (Mallory Dep. 10-17; Brennan Dep. 10; Colbert Dep. 8-12, 45-49.)

Defendant Ellis Corporation ("Ellis") is an Illinois corporation that manufactures industrial machinery in laundry, wastewater treatment, and heat transfer applications.  (SAC ¶ 5; Answer ¶ 3; Ex. A ¶ 3; Parrington Aff., Ex. B, Defs.' Responses to Pl.'s Phase I Requests for Admission at No. 1; Berger Aff., Ex. 9, Fesmire Sr. Dep. 10-11.)  Defendant Ludell Manufacturing Co. ("Ludell") is an Illinois corporation that specializes in metal fabrication, design of heat exchangers, and the engineering of energy conservation and water systems. (SAC ¶ 6; Answer ¶ 7; Fesmire Sr. Dep. 11.)  Ellis is owned by Robert Fesmire, Sr., and his wife, Victoria Fesmire.  (Fesmire, Sr. Dep. 8, 11.)  Robert Fesmire, Sr. is the sole owner of Ludell.  (Fesmire, Sr. Dep. 11.)

### 2.    Initial Negotiations

In July 2009, Defendants were experiencing substantial financial problems. (Fesmire Sr. Dep. 12-13.)  Their lender, American Chartered Bank ("American Chartered"), had told them that they should start looking for a new lender and had given them the impression that it was considering placing their loans in default or calling the loans.  (Fesmire Sr. Dep. 13-17.)

Robert Fesmire, Jr.'s father-in-law suggested that Ellis and Ludell retain Platinum as a consultant.  (Berger Aff., Ex. 11, Fesmire Jr. Dep. 13-14.)  In June

2009, Robert Fesmire, Jr. and Robert Fesmire, Sr. met with Dean Bachelor of Platinum at Ellis in Illinois. (Fesmire, Jr. Dep. 15-16.) Then, in July 2009, Robert Fesmire, Sr., Victoria Fesmire, and Robert Fesmire, Jr. traveled to Minneapolis to meet with Platinum's Bruce Mallory, Dean Bachelor, and perhaps other Platinum representatives. (Fesmire Sr. Dep. 12-13; Berger Aff., Ex. 10, Victoria Fesmire Dep. 11-12; Fesmire Jr. Dep. 20.)

According to Defendants, during these meetings, the Fesmires expressed their desire to get help obtaining loans from a new lender to refinance their existing loans with American Chartered, and Platinum told them that it had a number of banking contacts and could help them get their businesses back in shape and try to find a new lender. (Fesmire, Sr. Dep. 17-26, 32; Victoria Fesmire Dep. 13-14, 17-19, 34-35; Fesmire, Jr. Dep. 15-18, 20-28, 31.) Robert Fesmire, Sr. told Platinum representatives that he did not think American Chartered was going to continue with their loans to Defendants and that Defendants needed to find a new bank. (Robert Fesmire Sr. Dep. 29-33.) Platinum notes that no witness can identify any specific promise that Platinum made to assist Defendants procure financing. (See, e.g., Victoria Fesmire Dep. 35 (testifying that she never heard anyone at Platinum say that they were going to do certain things

to assist Ellis in getting loans from banks other than that they knew banks that they could introduce Ellis to, but that "by their saying that, it was implied that they would find us a bank"); Fesmire Sr. Dep. 22-23 (testifying, when asked if Platinum stated that it would do anything other than introduce Defendants to banks that Platinum knew, that he "felt that they meant that they could introduce us to people that would have a – that did that kind of work . . . [i.e.] help companies that were in trouble").)

### 3. The Written Agreements

#### a) The Preliminary Agreement

On July 16, 2009, Ellis and Ludell, through Robert Fesmire, Sr., signed an engagement letter from Platinum dated July 7, 2009 ("Preliminary Agreement"). (Parrington Aff., Ex. I, Preliminary Agreement; Mallory Dep. 28-29.)

The Preliminary Agreement provides that Platinum has

identified that the business is financially challenged and operating at below breakeven sales volumes, is under pressure from lenders and vendors and needs to consider operational changes in key functional areas. In addition, Ellis/Ludell needs to seek a clear strategy with associated marketing to improve bottom line profitability and long term viability in a very uncertain and highly competitive marketplace. Finally, the company would benefit from a well planned, smooth leadership transition allowing your son, Bob, to pursue other interests.

(Preliminary Agreement at 1.)  Platinum proposed to address these issues with

the following actions:

1. Conduct due diligence during the next several weeks by meeting people in the organization as well as selected outsiders (customers, bankers, accountants and attorneys) to gain a clear understanding of the situation.

2. Review the company's current financial condition in detail and develop a cash breakeven analysis, liquidation/preference analysis and contribution analysis for the business.  (As much as possible, we'll utilize work done internally and by the previous consultants).

3. Perform an operations review to identify and implement operational efficiencies, shop floor improvements, production scheduling ideas, cost saving opportunities, revenue enhancements and cash flow improvements.  Recommend organizational changes necessary to the future success of Ellis/Ludell.

4. Review the company's strategy and positioning and related current marketing and sales efforts and recommend improvements to deal with reluctant buyers.

5. Identify and recommend options for dealing with long term vendors who are in need of attention and payment. Determine whether or not an informal workout is appropriate.

6. Develop an exit plan for Bob, Jr. and provide monthly accountability follow-up sessions for the Ellis/Ludell management team to measure progress against goals.

(Id. at 1-2.)

Under the Preliminary Agreement, Defendants agreed to pay Platinum a "retainer" or "consulting fee" of $7,500 per week "for the first four tasks of this engagement . . . and [it] is anticipated to be completed in no longer than six weeks."  (Id. at 2.)  They also agreed to pay a "transaction fee" of three percent "of any monies secured on behalf of [Defendants] from an existing senior secured lender or sub debt lender, and five percent (5%) for any monies provided by new lenders or investors who are not currently providing capital to [Defendants]."  (Id.)  The transaction fee survived the Preliminary Agreement for 12 months following the end of the engagement.  (Id.)

At the end of the Preliminary Agreement engagement, Platinum met with Defendants to present its findings and recommendations.  (Colbert Dep. 35-37; Mallory Dep. 32-33.)  No one can find a written copy of these.  (Colbert Dep. 38-39; Mallory Dep. 34.)  No one recalls any findings or recommendations that Defendants should seek new financing.  (Colbert Dep. 43-46 (testifying that he did not recall any findings and recommendations regarding financing, but that, generally, the goal is to make a company financially healthy so that it is "bankable to many lenders so that the company has more financing options in the future"); Brennan Dep. 31-32 (testifying that he did not recall making any

recommendations about the lending situation); Fesmire, Sr. Dep. 48-52 (testifying that the only recommendations from Platinum before Agreement was executed that he remembered were working with vendors and cutting payroll); Fesmire, Jr. Dep. 38 (testifying that he had no recollection of discussing recommendations with Platinum).)

Mallory testified that, after Platinum was retained under the Preliminary Agreement, Platinum learned that American Chartered was putting pressure on Ellis. (Mallory Dep. 19.) Representatives from American Chartered showed up at Ellis unannounced during the first day of Platinum's on-site engagement, and Gary Colbert engaged in discussions with American Chartered during the assessment under the Preliminary Agreement. (Brennan Dep. 14-15; Colbert Dep. 34-35.) After American Chartered learned Platinum's findings and recommendations from the assessment under the Preliminary Agreement, the bank agreed to give Ellis 45 more days to see what happened with its financial viability. (Colbert Dep. 37, 40-42, 49-52; Brennan Dep. 27; Berger Aff., Ex. 4.)

### b) The Agreement

On August 20, 2009, Ellis, through Robert Fesmire, Sr. and Victoria Fesmire, entered into a new engagement letter with Platinum, through Mallory,

dated August 18, 2009 (the "Agreement"). (Parrington Aff., Ex. J, Agreement; Mallory Dep. 34-35.) The title of the Agreement is "Re: Engagement Letter for Continuing Work at Ellis & Ludell." (Agreement at 1.) Throughout the Agreement, it states that Ellis and Ludell are both parties to the Agreement. However, under Robert Fesmire, Sr.'s signature it only states "Ellis Corporation," not both Ellis and Ludell, as it had stated in the Preliminary Agreement. (Id. at 2.) The Agreement provides that Platinum had "completed [its] initial opportunity assessment and presented [its] findings to [Robert Fesmire, Sr. and Victoria Fesmire] that included [Platinum's] recommendations for improving the financial and operating performance of [Ellis and Ludell]." (Agreement at 1.)

Under "Scope of services," the Agreement states:

> Platinum will provide hands-on direction in the implementation of the recommendations, in the capacity of Chief Restructuring Officer. Gary [Colbert] will be on-site three days per week to develop, implement and lead the organization to make the necessary changes to facilitate a turnaround and improve operating and financial performance. Platinum will also ensure that the necessary leadership and organizational changes are made to facilitate a smooth and successful transition to management that succeeds us. This effort is expected to take about 6-12 months, with a $7,500/week retainer fee. Pat Brennan will continue to manage vendor relationships on behalf of Ellis/Ludell and will coordinate this effort from the Platinum office in Minneapolis.

(Id.)

The Agreement could be terminated at any time by either party with 2-weeks' written notice.  (Id. at 2.)

Under the Agreement, Platinum was entitled to three different forms of compensation.  First, Platinum was entitled to a $7,500 per week "retainer fee."  The Agreement explains that the "retainer will only pay for a portion of the time we plan on investing in Ellis/Ludell."  (Id.)  Therefore, second, Platinum was entitled to a "success fee."  The success fee consists of "10% of the Operating Cash Flow" from August 1, 2009 to December 31, 2009 and, in 2010, "the bonus will be 10% of improved Operating Cash Flow in 2010 over the 2009 annual results."  (Id. at 2.)  "The success fee will be advanced quarterly and measured on annual results."  (Id.)  Third, there is a "transaction fee" of "three percent (3%) of any monies secured on behalf of [Defendants] from an existing senior secured lender or sub debt lender, and five percent (5%) for any monies provided by new lenders or investors who are not currently providing capital to [Defendants].  This transaction fee will survive this agreement for a period of 12 months following the end of this engagement."  (Id.)

On November 5, 2009, American Chartered, Ellis, and Robert Fesmire Sr. entered a For[]bearance and Loan Modification Agreement ("Forbearance

Agreement"). (Berger Aff., Ex. 12, Forbearance Agreement.) Under the

Forbearance Agreement, American Chartered agreed to forbear from exercising

its default rights and remedies until May 1, 2010, and to provide $100,000 in

additional financing to Ellis in order to allow Ellis to improve its financial

condition through working with Platinum. (Forbearance Agreement at 5, 8;

Fesmire Sr. Dep. 54-56, 85.)

Based on the increased credit extended to Defendants by American

Chartered, Platinum invoiced Defendants for a $3,000 transaction fee under the

Agreement. (Fesmire, Jr. Dep. 44; Parrington Aff., Exs. O, P, Q.) Defendants

paid the $3,000 transaction fee. (See id; SAC ¶ 26; Answer ¶ 3.)

By the first quarter of 2010, Defendants were turning a profit again.

(Brennan Dep. 33.)

In May 2010, at the end of the forbearance period, American Chartered

informed Ellis that it would terminate its lending relationship with Ellis.

(Brennan Dep. 48; Berger Aff., Ex. 6.) American Charter gave Ellis additional

time to find a new lender to refinance the credit. (Berger Aff., Ex. 6.) Defendants

claim that Platinum led Ellis's efforts to obtain a loan from new lender by

preparing a bank book which summarized Ellis and Ludell's business activities

and finances to be distributed to potential lenders; identifying several potential lenders, providing the bank book and other information to them, and communicating with them regarding Ellis's business and potential loan terms; and vetting potential lenders, analyzing the terms of potential loans, and assisting Ellis in deciding on a new lender.  (Colbert Dep. 75-84; Brennan Dep. 48-52; Berger Aff., Exs. 6-7.)  According to Defendants, when Ellis's management attempted to be more involved in the refinancing process, Platinum discouraged their involvement and sought to maintain control of the refinancing process. (Colbert Dep. 84-85, 90; Brennan Dep. 50-51; Berger Aff., Ex. 8.)

### c)     The Transition Agreement

In early November 2010, the parties agreed to terminate the engagement and Agreement.  (SAC ¶ 28; Answer ¶ 17; Parrington Aff., Ex. K.)  On November 19, 2010, Platinum, through Mallory, and on November 17, Ellis, through Robert Fesmire, Sr. and Victoria Fesmire, entered into a third engagement letter dated November 12, 2010 ("Transition Agreement") to allow a 3-month period to transition Platinum's prior duties as Chief Restructuring Officer to the company's management team.  (Parrington Aff., Ex. K, Transition Agreement.) Although the signature line for Robert Fesmire, Sr.'s signature only lists Ellis, as

in the Agreement, the title of the engagement letter and the body of the letter

refer to both Ellis and Ludell.  Under the Transition Agreement, Platinum agreed

to:

1.      Oversee a smooth transition to a new banking relationship

2.      Weekly participation in management meetings by phone

3.      Weekly review and monitoring of the 13 week cash flow
        projections

4.      Assist as requested with any vendor communications
        regarding payment of old amounts

5.      Assist Bob with monitoring accountability of management
        team to PRD's

6.      Monitoring of Scorecard and detailed
        review/comment/questioning of monthly financial results

7.      Weekly phone calls with Bob Sr.; as requested phone calls by
        Tory.

(Id.)  Defendants agreed to pay Platinum $2,500 per month.  (Id.)

In October and November 2010, Ellis considered three potential loan

packages from three lenders and decided to pursue a potential loan transaction

with FirstMerit Bank ("FirstMerit").  (Berger Aff., Ex. 6.)  However, the deal was

not successfully closed, and Ellis began to negotiate a new loan with other

lenders.  (Id.)

Defendants' employee, Mark Benrus, first introduced Defendants to FirstMerit.  (Fesmire, Sr. Dep. 41.)  Defendants assert that Platinum did not solicit FirstMerit on Defendants' behalf; nor did it negotiate the terms and conditions of the deal with FirstMerit.  (Id. 41, 66; Parrington Aff., Exs. R, T.)  Platinum asserts that Defendants took the lead in obtaining additional financing, through Benrus. (Parrington Aff., Ex. L, Benrus Decl. ¶ 4 (averring that he "was also in charge of Ellis's and Ludell's efforts to obtain financing as alleged in the Complaint"); Parrington Aff., Ex. M , Supp. Benrus Decl. ¶ 4 (same).)

### 4. Testimony Regarding the Parties' Subjective Understanding of the Scope of the Agreement

Platinum's witnesses testified that one duty of a Chief Restructuring Officer was to provide assistance to Ellis to obtain new or additional financing, if needed.  (See, e.g., Colbert Dep. 56-57, 60-61, 63-65.)  Robert Fesmire Jr. testified that, during initial negotiations, Platinum told him that it assisted companies in trouble obtain financing, a buyer, or an exit plan and that Platinum could do that for Ellis (Fesmire, Jr. Dep. 16-18); that Platinum "would help [Defendants] to get in shape to obtain financing and try to obtain financing for [Defendants]" (id. 22); and generally that Platinum would assist in finding financing by preparing documents and bank books and contacting people (id. 25-27).)

Robert Fesmire Sr. understood the term "Chief Restructuring Officer" to mean that Platinum was "going to take it from where we are now and get us to a point where we are secure with a new bank.  Because we had already told him that this American Chartered Bank didn't want us in there."  (Fesmire, Sr. Dep. 29.)  Robert Fesmire, Sr. and Victoria Fesmire also testified to their understanding that, during the first meeting in Minneapolis, Platinum implicitly promised that it could assist Defendants in procuring financing from a new lender.  (Fesmire, Sr. Dep. 17-18 (testifying that Platinum said that "if we can get you in shape that we should be able to help you get another bank"); Victoria Fesmire Dep. 13-14 (testifying that Platinum stated, with regard to helping getting Ellis loans, that "that's not a problem"), 20 (testifying that she did not recall any specific things that Platinum said it would do to assist Ellis with its banking relationships other than introduce Ellis to banks), 34-35 (testifying that "it was implied that they would find us a bank").)

Platinum asserts that neither Mallory nor Patrick Brennan, the two Partners most involved in performing and overseeing turnaround services for Defendants, ever promised that Platinum would assist Defendants in securing refinancing.  (June 21, 2013 Mallory Aff. ¶¶ 6, 8, 10; Brennan Aff. ¶¶ 6, 8, 10.)

### 5. 2011 Refinancing

On May 23, 2011, FirstMerit issued a letter of commitment to provide additional financing to Ellis and Ludell and two additional entities. (SAC ¶ 29; SAC, Ex. D; Answer ¶ 18.) Ellis and Ludell eventually closed on the FirstMerit loan. (Fesmire Sr. Dep. 78-79, 83-84; Colbert Dep. 98-99; Parrington Aff., Ex. T.) The loan package totaled $6,455,000, $3,500,000 of which was loaned to Ellis and Ludell. (SAC, Ex. D.) FirstMerit was a new lender for Defendants. (Parrington Aff., Ex. B, Defs.' Responses to Plaintiff's Phase I Requests for Admission at No. 29.) Platinum claimed a transaction fee of $322,750, based on the FirstMerit loan. (SAC ¶ 42; Answer ¶ 22.) However, Defendants refused to pay on the grounds that Platinum did not assist them in securing the FirstMerit loan package. (Parrington Aff., Ex. R; Parrington Aff., Ex. T; Fesmire, Sr. Dep. 41.)

### B. Procedural History

On December 5, 2011, Platinum filed a Complaint against Ellis and Ludell in this Court. [Docket No. 1] On October 8, 2012, Platinum filed a Second Amended Complaint ("SAC") against Ellis and Ludell. [Docket No. 55] The SAC asserts: Count 1: Breach of Contract; Count 2: Unjust Enrichment; Count 3: Promissory Estoppel; and Count 4: Quantum Meruit. Platinum seeks $322,750 in transaction fees under the Agreement based on the FirstMerit loan.

Defendants assert the following counterclaims against Plaintiff: Count 1: Illinois Loan Brokers Act ("ILBA"), and Count 2: Breach of Contract. [Docket No. 58] In Count 1, Defendants claim that the Agreement was void because Platinum violated the ILBA by engaging in loan brokering without registering with the Illinois Secretary of State, failing to provide written disclosure statements, and failing to disclose information. They seek to recover all amounts paid to Platinum, plus interest and attorneys' fees. In Count 2, Defendants claim that Platinum breached the Agreement by allowing Colbert to fail to be on-site at Ellis three days per week and allowing him to perform services on other matters when he was there.

Defendants now concede that Platinum was not required to provide written disclosures under the ILBA and abandon any claim based on that allegation. ([Docket No. 77] Defendants' Opposition Brief at 2 n.2.) Counterclaim Count 1 is now solely based on the allegation that Platinum failed to register with the Illinois Secretary of State. (Id.)

Under the Pretrial Scheduling Order (Phase I) [Docket No. 57], the discovery and motion practice in this case is divided into two phases. The first phase is limited to the applicability of the ILBA as a defense to Platinum's claims

and as a basis for Defendants' counterclaims.  The current motions before the

Court are brought under Phase I.

Defendants have now moved for summary judgment, requesting that this

Court dismiss the SAC with prejudice and award Ellis $549,307.43, plus interest

and attorneys' fees, on Count 1 of Defendants' Counterclaim.  Plaintiff has

moved for partial summary judgment, requesting that Defendants' Counterclaim

Count 1 be dismissed and that Defendants' defense to Plaintiff's claims

predicated upon the ILBA be dismissed.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Celotex</u>, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  <u>Amini v. City of</u>

<u>Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

**B.    ILBA**

The ILBA provides: "It shall be unlawful for any person to engage in the

business of loan brokering unless registered under this Act."  815 ILCS 175/15-10.

Platinum admits that it did not register with the Illinois Secretary of State as a

loan broker.  (Berger Aff., Ex. 15, Pl.'s Responses to Defs.' Phase I Requests for

Admission at Nos. 7-8.)  But it claims that it is not a loan broker.

A "loan broker" is "any person who, in return for a fee, commission, or

other compensation from any person, promises to procure a loan for any person

or assist any person in procuring a loan from any third party, or who promises to

consider whether or not to make a loan to any person."  815 ILCS 175/15-5.15(a).

However, "[a]ny person whose fee is wholly contingent on the successful

procurement of a loan from a third party and to whom no fee, other than a bona

fide third party fee, is paid before procurement" is exempt from the registration

requirement.  815 ILCS 175/15-80(a)(5).

The Illinois Administrative Code provides that the ILBA "shall apply only

when the person engaged or sought to be engaged by the loan broker is

domiciled in this State or, when the company or business seeking to borrow, has

its principal office in this State, or the Loan Broker is located in this State." 14 Ill. Adm. Code § 145.50. Ellis is an Illinois corporation with its principal office in Illinois.

Furthermore, the Illinois Administrative Code provides an exemption for Certified Turnaround Professionals: "Any individual who has the designation of Certified Turnaround Professional (CTP) by the Association for Certified Turnaround Professional, while engaged in the practice of a Certified Turnaround Professional and whose service in relation to the loan broker transaction is incidental to his or her practice, is exempt from the requirements of this Act." 14 Ill. Admin. Code § 145.805.

The ILBA provides the following remedies for violations of the statute:

> A person who violates this Act, in connection with a contract for the services of a loan broker, is liable to any person damaged by the violation, for the amount of the actual damages suffered, interest at the legal rate, and attorney fees. If a loan broker violates any provision of this Act, in connection with a contract for loan brokering services, the contract is void, and the prospective borrower is entitled to receive from the loan broker all sums paid to the loan broker, with interest and any attorney's fee required to enforce this Section.

815 ILCS 175/15-60.

**C.** **Choice of Law**

The first issue before the Court is whether Illinois law, and thus the ILBA, or Minnesota law applies in this case.

### 1.    Legal Standard

"Federal courts sitting in diversity apply the choice-of-law rules of the forum state."  H & R Block Tax Services LLC v. Franklin, 691 F.3d 941, 943 (8th Cir. 2012) (citation omitted).  "Before a choice-of-law analysis can be applied, a court must determine that a conflict exists between the laws of two forums."  Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co., 604 N.W.2d 91, 93-94 (Minn. 2000) (footnotes omitted).  "A conflict exists if the choice of one forum's law over the other will determine the outcome of the case."  Id. at 94.

The Court must next analyze whether each state's law can be constitutionally applied.  Nodak Mut. Ins. Co., 604 N.W.2d at 94 n.2.  If there is an actual conflict and both states' laws can be constitutionally applied, the Court then applies the significant contacts test.  Id.

### 2.    Actual Conflict

The Court concludes that there is an actual conflict between Illinois and Minnesota law.  The ILBA prohibits any person from engaging in loan brokering unless the person registers with the Illinois Secretary of State.  Minnesota law

does not provide any similar registration requirements or restrictions on non-residential-mortgage-loan brokering. Therefore, under Minnesota law, loan brokering is permissible without registration, an activity that is illegal under Illinois law. Platinum admits that it is not registered as a loan broker in Illinois. Defendants allege that Platinum engaged in loan brokering. A loan brokering agreement without registration is void under Illinois law and is not void under Minnesota law. An actual conflict exists.

### 3.      Constitutional Test

"[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." <u>Allstate Ins. Co. v. Hague</u>, 449 U.S. 302, 312-13 (1981).

It is constitutionally permissible to apply the ILBA to Platinum. Platinum voluntarily entered into three contracts to provide services to, at a minimum, Ellis, an Illinois corporation with its principal office located in Illinois. Under the Preliminary Agreement and the Agreement, Platinum promised to and did provide services on-site at Ellis's and Ludell's offices in Illinois. Platinum

knowingly and purposefully contracted with an Illinois corporation to provide services within Illinois over a significant period of time. It would not be arbitrary or fundamentally unfair to apply Illinois law to Platinum with regard to its actions under the Agreement.

### 4.   Five-Factor Test

Under Minnesota's significant contacts test, the Court must address the following factors:

(1) Predictability of results;

(2) Maintenance of interstate and international order;

(3) Simplification of the judicial task;

(4) Advancement of the forum's governmental interest; and

(5) Application of the better rule of law.

Nodak Mut. Ins. Co., 604 N.W.2d at 94 (citation omitted).

### a)   Predictability of Results

"Predictability of results applies primarily to consensual transactions where the parties desire advance notice of which state law will govern in future disputes." Myers v. Gov't Employees Ins. Co., 225 N.W.2d 238, 242 (Minn. 1974).

The Illinois Secretary of State has adopted regulations that the ILBA applies "when the person engaged or sought to be engaged by the loan broker is domiciled in [Illinois] or, when the company or business seeking to borrow, has its principal office in [Illinois], or the Loan Broker is located in [Illinois]."  14 Ill. Admin. Code § 145.50.  Ellis and Ludell are located in Illinois.  Platinum did work for Defendants both in Minnesota and Illinois.  A Platinum representative was required to be in Illinois each week working on Defendants' restructuring.  Under the applicable regulations, the ILBA applies.  Thus, Platinum was on notice before it entered into a contractual relationship with Defendants that Illinois law purported to apply to its actions.

### b)      Maintenance of Interstate and International Order

> The second factor, maintenance of interstate and international order, is primarily concerned with whether the application of Minnesota law would manifest disrespect for [Illinois'] sovereignty [or vice versa] or impede the interstate movement of people and goods.  An aspect of this concern is to maintain a coherent legal system in which the courts of different states strive to sustain, rather than subvert, each other's interests in areas where their own interests are less strong.

Nodak Mut. Ins. Co., 604 N.W.2d at 95 (citation omitted).

Both Minnesota and Illinois have a legitimate interest in regulating business activities that occur within that state or target that state's residents.

Here, Platinum voluntarily entered into three contracts with Ellis, an Illinois corporation with its principal office in Illinois. Under the contracts, Platinum provided substantial services to Ellis in Illinois. Platinum conducted business within Illinois, and so it is subject to Illinois business regulations. The Court would disrespect the sovereignty of the State of Illinois to refuse to apply Illinois business regulations to protect Illinois residents based on actions taken largely within Illinois.

### c) Simplification of the Judicial Task

Under Minnesota law, Platinum's alleged loan brokering was legal – there is no equivalent loan broker statute in Minnesota requiring registration. On this subject, Minnesota law is clear and certain. On the other hand, the ILBA is rarely cited and there is little case law analyzing the application of the ILBA. "Although Minnesota courts are fully capable of applying the law of another state, the judicial task is obviously simplified when a Minnesota court applies Minnesota law." Medtronic, Inc. v. Advanced Bionics Corp., 630 N.W.2d 438, 455 (Minn. Ct. App. 2001) (citation omitted). This factor weighs slightly in favor of Minnesota law. However, this factor is usually not "given much weight" by the Minnesota Supreme Court. Nodak Mut. Ins., 604 N.W.2d at 95.

### d) Advancement of the Forum's Governmental Interest

This factor is neutral. To the extent that Platinum's alleged actions relate to financing that occurred in Minnesota, where that activity was legal, Minnesota's interest would not be advanced by applying Illinois law to potentially void the contract. On the other hand, to the extent that Platinum's actions occurred in Illinois, on-site at an Illinois company, Minnesota would have little interest in interfering with Illinois' decisions on how to regulate business activities within that state.

### e) Application of the Better Rule of Law

The fifth factor, application of the better rule of law, is rarely used by Minnesota courts and carries little weight. See, e.g., Nodak Mut. Ins. Co., 604 N.W.2d at 96.

### 5. Choice of Law Conclusion

Having weighed all of the factors, the Court concludes that Illinois law applies. The Court now turns to the question of whether the ILBA applies to Platinum and the transaction in this case.

### D. Whether Platinum Was a Loan Broker under Illinois Law

To be a loan broker, one must 1) make a promise to procure or assist in procuring financing for another; and 2) receive payment for that promise. 815 ILCS 175/15-5.15 (a). Platinum asserts that neither condition is satisfied in this case.

### 1. Whether Platinum Promised to Assist Defendants in Procuring a Loan

#### a) Standard for Contract Interpretation

"If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." <u>Air Safety, Inc. v. Teachers Realty Corp.</u>, 706 N.E.2d 882, 884 (Ill. 1999). If the contract language is susceptible to more than one reasonable meaning, then it is ambiguous and extrinsic evidence may be admitted to assist the trier of fact in determining the meaning of the contract. <u>Id.</u>

#### b) Discussion

Defendants argue that, in the Agreement, Platinum promised to serve as Ellis's Chief Restructuring Officer and that promise included an implied promise by Platinum to assist Ellis in procuring financing from a third party. Platinum argues that there is no contract that states that it will act as a loan broker. The

Court holds that there is a genuine issue of material fact regarding whether

Platinum promised to assist Defendants in procuring financing.

The Agreement is ambiguous regarding whether Platinum promised to

assist Defendants in procuring a loan. The Agreement does not provide a

definition of "Chief Restructuring Officer;" nor does it indicate which duties

belong to that position. There is no mention of assisting Defendants obtain

financing in the Agreement. Cf. Carlisle Invs. Group, Ltd. v. White, 852 N.E.2d

393, 395, 400 (Ill. App. Ct. 2006) (holding that investment company acted as a

loan broker when one of the express written purposes of the agreement was that

the investment group was retained to find a lender because, although "plaintiffs

also committed to perform, and did perform, other services . . . the main purpose

of the consulting agreement between the parties [was] to assist [the owner] in

obtaining a loan to rehabilitate the property").

Here, improving Defendants' finances was the thrust of the Agreement,

not finding new financing, which might or might not have been necessary once

Defendants' operations were improved. However, the role of Chief

Restructuring Officer is not defined within the two-page Agreement. When a

contract is ambiguous, the Court may examine extrinsic evidence of the parties'

intent, including preliminary negotiations.  See Air Safety, Inc., 706 N.E.2d at 884.

The ILBA does not prohibit the Court from examining extrinsic evidence to

analyze the meaning of an ambiguous written contract; the ILBA simply requires

that, in order to enforce a loan brokering contract, the contract must be in

writing.  815 ILCS 175/15-35.

The Court has considered the extrinsic evidence and concludes that there

remains a genuine issue of material fact regarding whether Platinum promised to

assist in procuring a loan.  There is evidence that the parties discussed Ellis's and

Ludell's lender concerns before the Preliminary Agreement was signed and

during the engagement under the Preliminary Agreement.  On the other hand,

Defendants cannot recall a specific promise Platinum made regarding obtaining

financing.  Also, the Agreement stated that Platinum would provide direction in

the implementation of the recommendations it had presented at the end of the

engagement under the Preliminary Agreement, and no witness can point to any

finding or recommendation that Platinum made with regard to procuring

financing.  The parties testified to conflicting understandings of Platinum's

obligations under the agreements.

### c) Whether Platinum Was Defendants' Agent

Platinum asserts that it was hired and acted as Defendants' agent as Chief Restructuring Officer. Platinum further asserts that an officer or agent cannot be a loan broker under Illinois law. Platinum concludes that, because it was an agent of Defendants, it was acting as Defendant companies, not as a separate entity. Thus, there was no promise from one entity to another to assist in procuring a loan from a third party.

The Court rejects Platinum's agency argument. In some respects, Platinum acted as Defendants' agent; however that fact is not relevant to whether the contract between Platinum and Defendants, defining their relationship, was voided by the explicit terms of the ILBA.

### d) Whether the ILBA Applies to Turnaround Professionals

Plaintiff argues that the Illinois legislature never intended to subject turnaround professionals to the ILBA. The regulations implementing the ILBA explicitly carve out an exception for turnaround professionals: "Any individual who has the designation of Certified Turnaround Professional (CTP) by the Association for Certified Turnaround Professional, while engaged in the practice of a Certified Turnaround Professional and whose service in relation to the loan broker transaction is incidental to his or her practice, is exempt from the

requirements of this Act." 14 Ill. Admin. Code § 145.805. Platinum admits that neither Platinum nor any of the individual persons who provided services to Defendants were designated as Certified Turnaround Professionals by the Association for Certified Turnaround Professionals. (Berger Aff., Ex. 15, Pl.s' Responses to Defs.' Phase I Requests for Admission at Nos. 21-26.) Platinum argues that this fact is irrelevant because the organization that oversees the designation of Certified Turnaround Professionals is the Turnaround Management Association, not the "Association for Certified Turnaround Professional," as described in the regulations. Thus, Defendants' strict reading of the regulation would render the entire portion of the regulation without meaning because there can be no individuals with "the designation of Certified Turnaround Professional (CTP) by the Association for Certified Turnaround Professional," an organization that does not exist. Platinum concludes that the regulation makes clear that Illinois recognizes that turnaround services are distinct from loan brokering services and has no intent to subject turnaround professionals to the provisions of the ILBA.

Defendants argue that, because certain certified turnaround professionals are expressly exempted from the ILBA, it follows that other turnaround

professionals who have not achieved this designation – such as Platinum – are not exempt. Defendants assert that, in 1993, the Turnaround Management Association formed the Association of Certified Turnaround Professionals to establish and administer the program to designate Certified Turnaround Professionals. They further claim that, effective December 31, 2007, several years after the Illinois Secretary of State enacted the pertinent regulation, the Association of Certified Turnaround Professionals merged into the Turnaround Management Association, which now administers the certification program. The record lacks qualified evidence of the history of this organization, as parties cited to a web page, which has since been altered. (See Turnaround Management Association, Our History, http://www.turnaround.org/About/History.aspx.)

Defendants further argue that the ILBA regulations' exemption for Certified Turnaround Professionals would be superfluous if all loan brokering services that are combined with turnaround services were exempt from the ILBA.

The ILBA regulations' carve out for certified turnaround professionals is problematic. Strictly speaking, no turnaround professional would qualify under the rule because, apparently, the name of the group certifying turnaround

professionals has changed and the rule was never updated.  On the current

record, the Court lacks evidence of the evolution of the group granting

certifications, so the Court cannot make a definitive ruling on the interplay

between the regulation and the name of the group offering certification.

However, the clear the intent of the regulation was to only exempt certified

turnaround professionals, and there is no evidence Platinum or any of its

representatives working with Defendants were certified by any organization, so

this exemption does not appear to apply.

> **2.** **Whether Platinum Received Compensation for a Promise to Assist Ellis in Procuring a Loan from a Third-Party Lender**

Platinum asserts that, regardless of whether it promised to assist

Defendants in procuring a loan, it is exempt from the ILBA because it never

received payment for any promise to assist Defendants in procuring a loan.  It

asserts that, to the extent it was paid for loan brokering, the payments were

wholly contingent on the successful procurement of a loan, so Platinum was

exempt from registering as a loan broker.

> **a)** **Exemption Based on Contingent Transaction Fee**

Under the ILBA, "[a]ny person whose fee is wholly contingent on the

successful procurement of a loan from a third party and to whom no fee, other

than a bona fide third party fee, is paid before the procurement," is exempt from the ILBA's registration requirement. 815 ILCS 175/15-80(a)(5).

The transaction fee was wholly contingent on the successful procurement of a loan and no part of it was paid in advance. (See Preliminary Agreement; Agreement; see also Fesmire, Sr. Dep. 47-48; Fesmire, Jr. Dep. 40-41.) If the transaction fee was the only fee paid to Platinum for its alleged loan brokering promise, then the ILBA did not require Platinum to register. The Court now turns to the retainer and success fee.

### b) Retainer and Success Fee

Platinum argues that the weekly retainer fee was in no way connected to any promise to assist Defendants in procuring a loan. The Agreement states that the retainer is for Platinum's "hands-on direction in the implementation of the recommendations, in the capacity of Chief Restructuring Officer." (Agreement at 1.) The retainer also compensates for Platinum's work developing, implementing, and leading the necessary changes at Defendants "to facilitate a turnaround and improve operating and financial performance." (Id.) It further pays for Platinum's work "ensur[ing] that the necessary leadership and

organizational changes are made to facilitate a smooth and successful transition to management that succeeds us."  (Id.)

Platinum points out that there is no statement indicating that the retainer fee was in exchange for any loan brokering services or that any of the findings or recommendations made by Platinum included a recommendation that Defendants should seek additional financing.

Additionally, the Agreement stated that Platinum had a right to receive success fees from Defendants if Defendants' operating cash flow improved on a year-over-year basis.  (Agreement at 1-2.)  The success fees were solely based on improving operating cash flow, not based on any loan brokering promises or efforts.

Defendants argue that the weekly retainer payment and the success fee were intended to compensate for all of the services that Platinum was providing under the Agreement, including, in Platinum's capacity as the Chief Restructuring Office, assistance in procuring new financing.  (See Colbert Dep. 68 ("These fees [success fees, retainer fees, and transaction fees] are tied to the services, in general, that we provided for the engagement for the turnaround of

the companies."); id. (agreeing that the weekly retainer and success fee compensated Platinum for its promise to serve as Chief Restructuring Officer).)

The Court concludes that the question of whether the weekly retainer and success fee compensated Platinum for promising to assist Defendants in procuring a loan is dependent upon whether the Agreement included a promise to assist in procuring financing.  There is no clear promise regarding financing in the Agreement, and no evidence that the recommendations that Platinum promised to implement included recommendations regarding obtaining new financing.  On the other hand, as the Court has explained, examination of the parol evidence leaves a material fact question regarding whether the parties intended that Platinum would promise to assist in procuring new financing in its role as Chief Restructuring Officer.

### E.    Unjust Enrichment, Quantum Meruit, or Promissory Estoppel

Defendants argue that, because the Agreement between Platinum and Defendants is void as a matter of law, Platinum cannot obtain recovery under equitable doctrines such as unjust enrichment or quantum meruit.  Because the Court concludes that there is a genuine question of material fact regarding whether the ILBA voids any part or all of the Agreement, these claims are permitted to remain at this stage of the litigation.

## F.     Equitable Estoppel

Platinum argues that Defendants should be estopped from asserting defenses and counterclaims under the ILBA because Ellis previously paid a $3,000 transaction fee arising from the $100,000 of additional financing provided by American Chartered in November 2009.  "[A]ll parties, when dealing at arms length, are charged with knowledge that contracts which violate the public policy of the State are invalid."  <u>Byron Cmty. Unit Sch. No. 226 v. Dunham-Bush, Inc.</u>, 574 N.E.2d 1383, 1387 (Ill. Ct. App. 1991).  Thus, if the ILBA does void the Agreement, Platinum cannot use estoppel to attempt to enforce it.  <u>See</u> <u>id.</u>

## G.     Existence of Damages

Platinum argues that, even if it was a "loan broker," its acts as a loan broker did not cause Defendants any injury, so the ILBA counterclaim fails. While some Illinois statutes require that a plaintiff "suffer[] actual damage" in order to state a claim, <u>see, e.g.</u>, 815 ILCS 505/10a(a), the ILBA does not require that Defendants suffer damages in order to pursue voiding the contract:

> If a loan broker violates any provision of this Act, in connection with a contract for loan brokering services, the contract is void, and the prospective borrower is entitled to receive from the loan broker all sums paid to the loan broker, with interest and an attorney's fee required to enforce this Section.

815 ILCS 175/15-60. Thus, although the ILBA allows an action to recover actual damages, the statute also separately allows an action to void the contract if the loan broker violated the ILBA, regardless of whether the potential borrower has suffered any actual harm. Defendants' failure to provide proof of damages at this stage of the litigation is not fatal to the applicability of the ILBA.

## H. Conclusion

The Court denies both motions for summary judgment. The Court holds that Illinois law applies, but that the Agreement is ambiguous regarding whether Platinum promised to assist Defendants procure a loan. Thus, the applicability of the ILBA to void the Agreement between the parties cannot be decided as a matter of law at this time.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Defendants' Motion for Summary Judgment [Docket No. 63] is **DENIED**.

2. Plaintiff's Phase I Motion for Partial Summary Judgment [Docket No. 68] is **DENIED**.

Dated:   October 25, 2013           s/ Michael J. Davis_____
                                    Michael J. Davis
                                    Chief Judge
                                    United States District Court